I appreciate everybody's cooperation in accommodating all of our visitors. We will now hear argument in case number 2008-1199 Broadcom v. Qualcomm. Mr. Chesler. May it please the court, Evan Chesler for appellant. I'm going to try to make five points in the 12 minutes I have. I've reserved three for rebuttal. First point is that the claim construction below on the 686 patent was wrong. Second is that the claim construction on the 317 patent was wrong and even if it were right, we believe it is plainly wrong, the claims would then be anticipated. Third, that the evidence for infringement was insufficient as a matter of law on the 010 patent. Fourth, that Broadcom's license to our largest customer, Verizon, renders the injunction improper under eBay. And finally, that we are entitled to a new trial because the court misapplied the law with respect to indirect infringement under the Seagate case. If I may, I'd like to turn first then to 686. The key question on 686 is whether the term global controller should be read into claims that do not mention global controller. Someone unfamiliar with this technology, what is a global controller? It controls everything? The universe, your honor, apparently. There is a common specification between this patent and the 244 patent. The specifications are identical. The specification, therefore, describes both a very broad invention that has to do with video encoding and within that broad invention, there are other inventions. One of which is a digital signal processor. They are plainly described as separate in the specification. There are diagrams that show it. There is text that shows that they are separate. However, the 686 patent claims the digital signal processor, not the larger video encoding system, which is specifically described in the 244 patent. The 244 patent repeatedly refers to the global controller, which is part of this much larger system. But as this court held in the Ventana case, the fact that there are elements in the specification does not mean that those elements should be read in as limitations to a claim that doesn't claim those elements. Is it your position, given what you think is the proper claim construction of the DSP, that the prior art shown in Figure 2 of the patent discloses every limitation of Claim 1? Yes, the limitations of Claim 1 are what are just laid out, your honor, and they specifically talk about it. DSP controller, plurality of processing units, at least one storage unit, and then the controller controlling the plurality of the processing units. If that's the case, then why wouldn't one skilled in the art reading the patent and reading the specification conclude, therefore, that Claim 1 has to be interpreted to disclose something in addition to what's shown in Figure 2, which is labeled prior art? Because, your honor, the court itself found in the Markman proceeding that the digital signal processor can function either with some larger controller that's out there, in this case the global controller, or without it in a different mode. It then reversed itself when it got to the summary judgment opinion, when it realized that without a global controller in the claim, it would be anticipated by the Texas Instruments C80 chip, because everything else was in the chip. Then the court said, contrary to what it said in Markman, there must be a global controller read in where it does not appear in the claim. My point is, the court could not read in a limitation that's not there because it appears in the specification relating to a broader invention in order to save the claim from invalidity. Let me turn with that, if I may, to the second point, which is the 317 patent. The key issue on the 317 patent is whether a single transceiver, and there's only one transceiver called out in the Claim 1 of the 317 patent, can simultaneously participate on two networks. The district court read simultaneous to be exactly what the specification refers to as multiple or concurrent communication. The specification constantly distinguishes between two situations. A situation in which you have a radio unit with two transceivers which can simultaneously participate in two networks on the one hand, and a radio unit that has one transceiver that can only participate in two networks if it does it in an interleaved, concurrent, or multiple way. Do you agree that it's not possible for a single transceiver to communicate at the same instant with two different wireless networks? Absolutely. That it's impossible? So far as the current technology would indicate, it is impossible. Absolutely. And so what the district court did is exactly what the district court did in the Chef America case, which Your Honor decided, Judge Friedman wrote, where the claim said you must heat the dough to 700 or 800 degrees Fahrenheit. And the evidence was clear that the dough would burn up into a crisp. So the plaintiff contended in that case, and the district court said, well, in that case, we'll interpret it as meaning the oven should be heated to 800 degrees. Because obviously, if you heat the dough to 800 degrees, it won't work. And this court held, even if the claim as drafted is nonsensical, you cannot rewrite the claim in order to make it operable. And that's what the district court did here. Well, that's only assuming that there's no dispute as to what simultaneous can mean. And there can't be, Your Honor, because the specification makes it clear. It says over and over again, if you have two, you can communicate simultaneously. If you have one transceiver, you can only communicate by interleaving back and forth in concurrent or multiple form of communication. And is that mainly column 12? Is that what you're referring to? Column 12, column 13. There are multiple, Your Honor. I would refer you to figure 37 at 8276 of the record, figure 34. Wait. Let me just start one at a time. I know we're in a hurry. You have a lot of cover. But it's a column 12. I apologize. I mean, is your basis for saying that because they use simultaneous participation in that language, and then they use concurrent or multiple participation? Yes, and, Your Honor, as well, if you look, for example, at figure 37 in the specification at 276 of the record, one transceiver, and how is the communication described with the two networks? Concurrent. If you look at figure 34 at 238 of the record, two transceivers. How is the communication described? Simultaneous. And on and on and on throughout the specification. So, yes, I do rely on columns 12 and 13, as in addition to all the other places. And, yes, if there's one transceiver, you cannot communicate with two networks simultaneously. Let me add just one other kind of technical point on that. In the district court's claim construction, you appealed the latter part of the construction right during the same period of time. Did you also, I didn't understand you to appeal because the stuff that preceded that was talking about the sleep mode, either active or in the sleep mode, and you don't take issue with that aspect of the construction? We do take issue with the notion that you can participate while you're sleeping, which is what I understand Broadcom and the court to argue here. The way they get around the fact that you cannot talk to two networks at the same time unless you have two transceivers, that they say, well, the district court said, well, if you're sleeping on one and you're talking to the other, then you're participating in both at the same time with only one transceiver. That, Your Honor, is not what the specification describes in terms of participation. It is not the common meaning of participation. I can assure you when my wife is talking to me and I am sleeping, she does not believe I'm participating in that conversation. That's not the common meaning of participation. What they're saying is, even if Qualcomm is right that simultaneous means simultaneous, then we win anyway, says Broadcom, because you can be asleep at one time and talking on the other network and do that simultaneously. It's perfectly clear that unless you're talking or listening, you're not participating under the specification and you cannot do that on two networks at the same time with one transceiver. Is there a difference between participation and communication? No, I don't believe there is. And that's, in fact, exactly the way the specification talks about participation. Communicating. That's why I asked the question. What they're saying is, if I'm sleeping on one network, I'm not speaking, I'm not communicating, I'm asleep, I'm participating, and that's how they get around the problem of what simultaneity means. Now, if they're right about that and I submit they're wrong, then they walk smack into the Burson patent. And I would ask this court, if you're considering whether their interpretation and the court's interpretation is right, just compare two things in the record. Compare their expert's testimony, Mr. Stark, at 1492 with the Burson patent at 1565. They're exactly the same thing. It's waking up from time to time to listen to hear whether you have a message. Stark refers to that as sleep mode, and Burson refers to it as standby. And Burson is prior art that would render that interpretation anticipated. It's a wrong interpretation for the reasons I've dwelled on, but it would render it anticipated if it were. The only thing they say in response to that is, we had two early applications, which are constructive reduction to practice, and I submit to the court, if you look at those applications, particularly look, for example, at 1581, 1585 of the record, 1695, both of those applications refer to a single protocol. The claims are multiple, plurality of protocols. They didn't constructively reduce it to practice because they didn't disclose this invention. They disclosed a different invention. Burson's prior art, it would anticipate the claim if the incorrect interpretations were applied. If I may, I'd like to turn to the 010. All I want to say about the 010 is that the issue is, is there an interface circuit in the phone that selectively couples to the networks? And the analogy I would use for the court is, you buy a ticket here in Union Station to go to Pittsburgh. You travel out the same track, whether you're going to Chicago or to Detroit. You ultimately want to go to Chicago. You leave here. You go to Pittsburgh, and in Pittsburgh, you get off the train, and you select which track you're going to, either Chicago or Detroit. That's where the switch takes place. That's what happens in our case by their own explanation of the way the network works. The networks are selected way out in something called the infrastructure, not in the phone. If you got on the track here at Union Station that took you directly to Chicago, to your destination, or you could have gotten on a different track directly to Detroit, the switch would be here in Washington. But how you get there is what's critical to the patent. And here, it's as if you were going to Pittsburgh first and then selecting your switch to which town to go to. And what the court determined was that that was sufficient to constitute what the jury determined here, based upon the court's instructions, that was sufficient to constitute a switch in the phone. It's not. Let me turn to the injunction, if I may. The only thing I want to say about the injunction, and there's lots to be said, but I have very little time, is the Verizon license. And I would ask the court just to think of our business, Qualcomm's business, as two parts. We sell products to Verizon. We sell products to other people. Verizon's our largest customer. They're the largest CDMA carrier in the country. What the court concluded is that if we sell infringing products to Verizon, they're covered by the license that Broadcom gave Verizon weeks before the relief trial, and we are specifically immunized from liability for those sales. If we sell the identical products to Sprint, then the court concluded that that's irreparable injury, that you cannot determine a remedy at law, that the public interest favors that injunction, and that the balance of hardships tips in the right direction. The same products from the same company to two different customers, one they licensed at the last minute, one they didn't, that does not satisfy eBay. What eBay says is this court must apply the same four-element test to these injunctions as it would to any other area of the law. If I said to you, I want to enjoin you from getting on the west half of my property, but it's okay for you to walk across the east side of my property, you would all say, unless there's something unique about that, it can't be that you're suffering irreparable harm if I walk across that blade of grass and not across that blade of grass. This customer that's been licensed is our largest customer, and the only justification the district court gave for distinguishing here was that the injunction was against a customer and not a competitor. This license favored the largest customer of the biggest competitor, us. That's a distinction without a difference. You cannot satisfy eBay in light of the Verizon license. Lastly, new trial. The court cited one factual circumstance in its jury instruction on both indirect infringement and on willfulness for what the jury could look at as a factual circumstance. Did we get an opinion of counsel? Since the Seagate case, obviously there is no duty to have done that. We had an opinion on invalidity, and we elected in the pre-Seagate world not to use it. We had a right to do that, and the court did not allow references to it at the trial. The record is literally littered with references to our not having an opinion on non-infringement. The jury was told that getting an opinion of counsel was the fact that they should look at. It was the only one mentioned in the instruction. The court was so troubled by that after the Seagate opinion, that it set the willfulness verdict aside. In its tentative opinion, it also set the indirect infringement verdict aside for exactly the same reason, because that was the only evidence of specific intent. When we got to the argument of that motion, I pointed out that all the damages on two of the three patents would have to be set aside if indirect infringement were set aside. Is it your view that post-Seagate, you can't allow evidence with regard to opinions of counsel in connection with inducement? No, not at all. My view is, Your Honor, that there's no longer an obligation to get it, and that was the only thing the jury was told they should look to as an indicator of whether or not we had a specific intent to infringe, and whether we had acted with the appropriate level of objective recklessness to justify a willful infringement. Under all of this said under the willfulness instruction, or part of it said under the inducement? Both. The court first set it under inducement and said, I'll have more to say about that under willfulness, and then repeated it again. Both places. That's why the court tentatively set aside both verdicts. But the instructions were different. They were separate instructions. Separate instructions, but in both instructions, the common denominator, Judge Lynn, was the only factual circumstance mentioned in either instruction was, did they get an opinion of counsel? That was the only one. And so what we did was we sat through a trial at which our witnesses were badgered over and over again with, why didn't you go to the lawyers and ask them if there was infringement here? But is it your view then that under DSU or under inducement, that would be improper? That that kind of evidence with respect to an opinion of counsel would be improper? Forget willfulness. Let's assume willfulness is not in this case. No, not necessarily, Your Honor. So what is the problem here? Well, the problem here was we made an election, remember, under the old law about whether or not we could rely upon the other opinion. Remember, the law changed on the sword shield problem. So we were playing out of a different set of rules from what the plaintiff was. We made an election not to use one opinion. Then our witnesses were cross-examined. Invalidity. Invalidity. You can't infringe an invalid patent. Our witnesses are asked about no infringement opinion. And then the jury is told the only thing they're told to look to as a factual circumstance is, did they get an opinion of counsel? There's no longer an obligation to do it. You can do it if you want. It's useful evidence to show you had good faith if you want. But it's no longer an obligation to act in that way. It was at the time of the trial, the rules changed before the court entered the judgment here. And when the court saw that, the court itself said, I want you to come back in and tell me about the implications of Seagate. Issued a tentative opinion after we briefed it saying, both indirect infringement and willfulness are going to be set aside. And then when we pointed out that the damages had to go along with the indirect infringement verdict, because they rested only on indirect infringement for two of the three patents. And then we pointed out that the facts as to those were so intimately intertwined with what was left, which at that point was direct infringement of one patent, that the whole judgment had to be set aside under this court's precedence. The court did an about face, 180 degree about face, and said, I'm leaving indirect infringement in place. But the issue of the state of mind with respect to inducement was clearly before the court, before the jury, presented in a separate instruction, and consistent with the heightened standards set forth in DSU. And the jury was told that when they were considering whether that standard was met, they should look for example, and it was the only example, to whether or not we had obtained an opinion of counsel. But that's not wrong, is it? It would be today, absolutely, because today there is no obligation to do that. It would not be wrong to admit evidence on whether or not we did it, but it would be, I submit, reversible error to point to the only issue of whether or not we obtained something, which we now have no duty to obtain, as the evidence that we had the specific intent to infringe, not to practice the elements of the patent. So you're saying the decision in Seagate, which dealt entirely with willfulness, and whatever we said there with respect to an opinion of counsel or not, affects DSU or affects inducement cases how? Because here, the two instructions on indirect infringement and willfulness, only both of those instructions... Let's just say, just try to direct my question. How does Seagate impact a case which is exclusively, let's assume we have a case that's exclusively a DSU inducement case with no willfulness. What implications does Seagate have with respect to the evidence and the jury instruction in an inducement case? If the jury instruction in an inducement case were simply given to recite the standard under DSU, that's all. And what about if they said an opinion of counsel, talked about an opinion of counsel, used the same language they used here? No, then it would be... Why? Well, because now there is no duty to obtain an opinion of counsel, and if the court said... But isn't either obtaining an opinion or not obtaining an opinion a circumstance relevant to the state of mind under DSU? Yes, it is. I believe it is still a relevant circumstance, but let me make clear what I'm trying to tell the court. Prior to the change in the law of sword and shield issue, which got changed at the same time, parties routinely, and I recommended this to clients all the time, routinely made elections not to rely upon opinions of counsel because of the waiver implications, because there was no way to define what the meets and bounds of that waiver would be, and you could end up waiving as to advice that went to more of the merits... I understand that argument, but it seems to me you're making two different arguments, and I understand one and not the other. I mean, to the extent that you're saying that you were prejudiced given that the pre-Seagate law was out there, you made determinations of opinion of counsel that infected, in a negative way, your ability to defend yourself on the... to press the inducement issue, right? Right. That's one issue. Yes. But are you making a second argument that somehow the law changed with respect to opinions of counsel in a way that should have changed the inducement instruction given here? Yes. And I'm saying this. I'll make up the charge right now, and I hope you won't hold me to every comma and apostrophe, but what I would... I believe it would be something like this. You can consider a number of factors in determining whether there was a specific intent to infringe this patent. For example, whether they knew about the patent at the time of the activity. The evidence here is undisputed. These were all developed without any reference to or knowledge of these patents. You can consider whether or... what the defendant said in promoting the product, and whether they were specifically promoting the product in ways to infringe the patent, aware of what would constitute infringement. You can consider whether they had an opinion of counsel, even though they have no duty to get an opinion of counsel. So here they didn't say... did the instruction here with respect to inducement say, and, you know, there's an obligation... they had an obligation to secure an opinion of counsel? No, but it didn't say they didn't, and it was the only thing the court referred to in trying to give the jury some guidance as to what constitutes... So you're saying if some district court judge out there tomorrow is giving an instruction with respect to inducement, if he refers to one of the factors you might want to look at as being an opinion of counsel, unless he makes clear that he has to affirmatively say that it's not required in order for it to pass muster? No, Your Honor. I don't say that necessarily. But if the court is giving an instruction, as I tried to summarize in answer to the court's question, that lays out a number of issues that should be considered in determining that, then I think it's perfectly clear to a jury that they should take all of those factors in context and decide whether there was a specific intent to infringe. Where the court recites one and only one element, the necessary implication to the jury is, boy, if they didn't do that, they must have had a specific intent to infringe. They never said anything about did they know about the patents when this product was developed. Did they promote the product in a way that specifically did it? There was... If you'd just give me one moment. One last point, very briefly. Yes. The court did say, the district court did say, with respect to the willful instruction, that there was a duty to avoid. A duty to avoid. And what's the only fact that is then given both in the willfulness instruction and in the indirect infringement or inducement instruction? Did they get an opinion of counsel? But I'm reading it, 2195 of the appendix, and I don't want to belabor this, but it seems to me, am I looking at the wrong thing? 2195, it says, seems to say, in the totality of circumstances, you may consider all of the circumstances, including. It didn't say this is the only factor you can look at, this is the be-all and end-all. It did say what I thought you were kind of advocating here a few minutes ago. No? No. It said, you can consider all the circumstances, and then after days and days of trial, the only thing that's cited is this question of opinion of counsel. The court needs to understand, if you look at this series, the only thing that's mentioned in the instruction by the district court, after it says you can consider all the circumstances, the only way to get a sample. There was other evidence presented, was there not? If you look, as we pointed out in the briefs, if you look at the evidence, there's nothing that precedes the litigation. Go back to Judge Prost's question about what the standard is for the specific intent to infringe. There's nothing here. The conduct is all post, not pre-conduct, which is one of the critical issues in the post-Seagate world. I suspect why it wasn't mentioned as an example. That's a critical piece of this. There's nothing mentioned in the instruction about promotional materials, and where is it that they said, here's what you want to do with this to infringe. There's one thing. They say a duty to avoid, and there's one thing that's mentioned, which is the opinion of counsel. And I would submit that where the rules changed, there was a reason why the district court thought it went both to indirect infringement as well as willfulness, and then reversed himself. Because the two were tied together specifically in these instructions. And I'm not advocating a rule that in every indirect infringement case, regardless of the instruction, Seagate requires that if you mention opinion of counsel, it's error. Here they were specifically tied together in the context of a duty to avoid, and it's the one example that was given. And that infected the verdict. I thank you very much, Mr. Chesler. We have used up all of your rebuttal and then some, but we'll restore your three minutes of rebuttal. Thank you very much. And Mr. Lee, we'll hear from you and we will add eight and a half minutes to your time to balance the playing field. Thank you, Your Honor. May it please the court. My name is Bill Lee and together with my partner, Richard O'Neill, I represent the Appley Broadcom. Let me address the five points that Mr. Chesler raised in reverse order, but I also, at the end, would like to give a minute or two to the motion to strike. It's pending before Your Honor, before the court. Let me start with the inducement issue because Mr. Chesler's argument is made as if, in many circumstances, a trial did not occur and there are not standards of review. And Judge Prost, you were getting at this issue. On the inducement issue, there are two separate issues. First, there is the question, the legal question, of whether the instruction was correct. The second is, is there substantial evidence to support the jury's verdict? There, in fact, was inducement. Let's take the legal issue first. DSU is accurately reflected in the court's instruction number 23. It's at page 2194-295. I don't think Mr. Chesler is raising a point with respect to the instruction. He actually, in their brief, Your Honor, they do. And I think he actually just reiterated it in response to Judge Prost's question. They contend that DSU is no longer good law as a result of Seagate. And that simply is incorrect. Their argument, to Your Honor, in the brief is that nor Bremsey and Seagate have changed in some substantial way, have overruled DSU, and that's incorrect. DSU, both the panel portion of the opinion and the en banc portion of the opinion, stand as good law. And there are three critical points about it. First, it says that part of the standard is, should the alleged inducer know or should have known that they were inducing the acts? And second, that they have to have a specific intent. Seagate and nor Bremsey do nothing to change that. And the charge is 100% consistent with DSU. What about Mr. Chester's point, however, that they were somehow prejudiced in terms of the evidence? Because we know, and I think you would agree, pre-Seagate, I mean, we were led to believe that people were withholding opinions because of waiver issues. Your Honor, when the court considers the recording of this argument, Mr. Chester's argument, I'd ask you to compare what he said the judge should have charged in response to your question to what the judge charged, because the judge charged exactly what Mr. Chester said. Now, let me take two separate issues and distinguish them. There was the inducement instruction, which is at 2194-95. It actually said you are to consider the totality of the circumstances, including knowledge of the patent and other activities. And one thing you could consider is advice of counsel. In fact, in DSU, in the panel portion of the opinion, the court considered conflicting opinions of counsel as evidence of intent or lack of intent. Now, Mr. Chester says that, well, you should have done more. You should have said that the absence of a lawyer's opinion is insufficient to support a finding of willfulness. You should have said that just because someone didn't get an opinion you can't find willfulness. Let me read you what the judge charged because contrary to what Mr. Chester suggested, this district court in this 2,500-page transcript and 14-day trial was very attentive to the detail of this court's ruling. KSR was decided the first day of trial. Seagate was decided one week after the injunction proceeding. He did a wonderful job of addressing these issues. Here's what the charge is and compare it to what Mr. Chester said. Quote, and this is in the willfulness portion, the absence of a lawyer's opinion by itself is insufficient to support a finding of willfulness and you may not assume that merely because a party did not obtain an opinion of counsel, the opinion would not have been unfavorable. Now, that is an accurate description of law of willfulness pre-Seagate. It certainly is consistent with what Mr. Chester has asked this court to charge, suggested this court with the appropriate charge and that against that backdrop when you get to the factual question, Mr. Chester is referring to an opinion they received 18 months after the lawsuit was filed, 23 months after they found out about the patents and they never told us what it said one way or another. The question of whether they got an opinion of non-infringement was relevant. Now, Mr. Chester says that the witnesses were badgered on the issue. I guess I was the badgerer because I was asking the question. But as you know from the district court's ruling, he said that wasn't true. He said it was one issue in the context of many and on this issue, just to close out the inducement issue, he had the proof of the acts of inducement which were legion including a description by their own witnesses  that they were partnering in design, testing, and development of products. He had before him the fact that they knew of the patents in advance of the lawsuit and he had before him the chief technical officer of the whole company who's been there for two decades who testified at both the trial and injunction proceeding and what did he say to the jury? He said, I haven't read one of the patents. I've perused the other and as to the 317, I looked at it three weeks before I testified. So two years after the case was filed, the chief technology officer who's responsible for all of this says, haven't read one, perused another, recently read the other. That is sufficient to support inducement. Let me go to the 010 because I think this is also a case where the context is critical. Were you going to do the eBay injunction and the Verizon license? I was. I was going to actually just slightly reverse. I'm trying to move quickly to get to Mr. Chesler's conversation with his wife when he's sleeping. Just on the inducement point briefly before you move on, what form of notice was provided to with regard to these three patents? Your Honor, the way the trial felt was the parties agreed rather than have proof of notice for the damages period. We agreed the damages period would begin about three months in advance of the trial and stipulated to that so that the proof before the evidence before you and the record is our stipulation that that's when the damages period would begin. That was our agreement on when notice was given. So it seems to me that's relevant to the heightened intent requirement of DSU. It's just one thing to show evidence of intent to commit an act but now it's something different to show the specific intent of to infringe. Your Honor, I think that's true and I think that I would say these three things. That notice date which in advance of the trial was given was the date that we agreed upon. There were a series of cases all which came to be at the same moment in time one of which is getting argued in August. Second, once they had noticed the question of what they did was fully litigated and there was substantial evidence to support the verdict. Third, Your Honor, the question is if the instruction is correct, was there substantial evidence to support the jury's verdict? There was described in our briefs Judge Selna reviewing testimony said that there was no changing of direction as Qualcomm suggested. There was substantial evidence to support the jury's verdict under correct instruction. Your best summary of the substantial evidence with respect to intent to infringe. Very brief. I'll give you three. First, Your Honor, I would refer you to the evidence that's cited in the record of the acts of infringement and the testimony of the witnesses who committed them because from them themselves, there is circumstantial evidence of intent. Second, there is the testimony of the chief technology officer who wasn't there testifying for himself. He was testifying about the fact that  chief technology officer was not there testifying for himself. Third, I would bring your attention to the evidence that's summarized in the judgment as a matter of law, which said there is evidence of the absence of an effort to obtain an opinion of counsel until 18 months after the case had started. There's not much more save for an email that's going to admit that you're going to have. Again, this is a place where it's important to remember that a trial occurred with instructions and a set of rules. And again, I'd like to go back to Mr. Chessler's argument where he said with great emphasis, there's no interface circuit in the phone. That's what he just said to you. Here's a quote from Dr. Fye, their expert at page A2107. Quote, there is an interface circuit inside the phone. So what is framing or packetizing? I think it's critical for us to focus upon the fact here that there has been no challenge to the claim interpretation. The proof was undisputed that you have a phone. If you want to send a call over the public switch telephone network, you push send. If you want to send a call over the Internet, you hit the push to talk button. Once you hit those buttons, the circuits within the phone itself frame or packetize the data as their own experts said. They packetize it if it's going over the Internet, they frame it if it's going over the public switch telephone network, and based upon what happens in the phone, it can only go one place. Now, the argument that Qualcomm makes in its brief is a little different. They said it can't happen if it's happening wirelessly. We've drawn the court's attention to the specification of the 010 which says it can happen wirelessly. It can happen with a direct electrical connection, it can happen wirelessly. There was substantial evidence, and not just from Dr. Phi who had some difficulty on the stand, but Dr. Min testified and described exactly what the product was doing, applied the court's claim interpretation, and the question before this court is, is there substantial evidence? The Verizon license. Let's step back and look at what happened last August. There wasn't just a Verizon license that came into being. There was an extensive eBay hearing that occurred three months after the jury trial in which the court took written testimony, took cross examination for a number of witnesses, fully considered the Verizon license. Now, the Verizon license, as the evidence demonstrated, was executed in part to deal with not only the claim of public harm, harm to the marketplace and competitors in this case, but also in the international trade commission proceeding that was heard yesterday. There was a claim at the time, and I'd ask the court to consider this claim at the time, that for Qualcomm and its customers, catastrophe was just around the corner. That was the claim that was being made. And Broadcom did enter into a license with Verizon. It wasn't obligated to enter into a license with everyone. It entered into a license with Verizon that mitigated the harm to the public marketplace, which is one of the eBay factors. What the district court judge did, and as your honors know, given the motion to strike, he revisited it on two occasions to be sure he got it right. He heard testimony on Qualcomm's claim of harm. He also heard testimony quite candidly that Qualcomm had made statements to the public marketplace that were not consistent with what was being said to him. And he heard testimony on the potential harm to third parties and subscribers. He weighed all of that, including the Verizon license, and said here's how I  look at those different considerations. Qualcomm, you are entitled to an injunction that projects your legitimate interest in your intellectual property. Qualcomm, you infringe and have been adjudicated an infringer, but will put in place sunset provisions as to many chips that will allow you to continue to sell. And for instance, you can sell your 3.10 version. The Verizon license is just one element in all of that. And the best indication that the confusion that Mr. Chessler described, that Verizon license has been around for a while. The injunction hearing was a year ago. People have reported to the public securities marketplace the injunction because of the sunset provisions was not causing it any substantial problem. The judge, we suggest, got it correct, but in any event, it's an abusive discretion standard dealing with his eBay analysis. Let me turn to the 3.17 patent. Let me just add here on the motion to strike. This may be the right place. I think that given eBay and given the really diligent efforts many district courts are making today to balance the factors, this court and the other judges on the federal circuit are going to see more circumstances where there are injunctions, sunset provisions, and phasings. And you're going to see more circumstances where there is an injunction entered, amendments, clarifications. We would  have the institutional best interest of the court, but allowing full briefing after every one doesn't make sense at all. And we think that your honors, the courts, this panel's April 11th order was clear. Let me go to the 317 patent. Both for the 317 patent and the 646 patent, Mr. Chesler and Qualcomm have made arguments to you that are inconsistent with the claim language and specification. Let me take the 317 and go to simultaneous participation. What Mr. Chesler didn't say is the terms participation, the terms communication, and the terms registration are all used in the patent. The term active participation and sleep are all used in the patent. The court would have to go no further than figure 44, which actually uses the words participation, sleep, and then there's active participation, actually there's slave participation, there is sleep mode, and there's registration. If you look at this diagram, figure 44, and in fact the district court cited figures 43 and 44 in its claim interpretation, it said this. Figure 44, your honor. What the district court said is this, and it was correct. What the district court said is the patent talks about participation. It tells you in figure 44 that participation can be in sleep mode or active mode. It says it explicitly in the patent. In fact, when your honors consider the briefing, you'll see that at least in our view, Qualcomm didn't take issue with the fact that participation could be active communication or sleep mode. If you take as a proposition that the patent says there is participation and participation requires registration, once you're registered, you can be active  or sleep active. It makes perfect sense. He's saying you can simultaneously participate because you can be sleep sleep, active sleep, sleep active. In fact, you could be active active today. He looked at figure 34, and figure 34 expressly describes just what I've said. Figure 34 read against the specification says there are two different modes once you're registered. One is active, one is sleep, and the way it works in figure 34 is the hash portions are sleep, and the active portions are clear. And there are two networks that are communicating with themselves. Two networks with whom you're communicating, and you're registered on both simultaneously, and you are in sleep mode on one, active mode on another. The judge had it. My recollection is that Qualcomm says about figure 34 that this portion, which is I guess talked about in column 53, doesn't use the term simultaneous participation. Your Honor, in describing that particular diagram, I didn't use expressly that phrase, but if your Honor considers what the text says, it says you're communicating on one, you're registered, you're communicating on the other, you're registered, and at different times you're asleep on one, you're active on another. It's describing exactly what his Honor said. For both the 317 and the 686, the claim language is important. It's critical. The claim language says you have a single transceiver and you're simultaneously participating. The question is how would one of ordinary skill in the art read it? Mr. Chesler has conceded that one of ordinary skill in the art would not read it as actively communicating at that precise moment in time because we're a matter of physics, you can't do that. So the question is how does one of ordinary skill in the art read it? That's where figure 34 is instructive. More instructive is at column 12 and 13. At the bottom of column 12 and top of column 13, the court will find the terms fully participate. Fully participate is used in the patent to describe the two transceivers and you can actively communicate at the same moment in time. Again, the court got it correctly. Qualcomm simultaneous participation claim interpretation would not cover figure 34 and the question is how can that be? In my last two minutes, let me go to 686. Speaking of 686 and looking at the claim language, I don't see, clearly the global controller is not in the claim language. Your Honor, this is a place where I like to go directly to the claim language. If we go to the claim language, which is at A193, the critical question, Your Honor, is what  the court construing? Because the briefing, Qualcomm's briefing, collapses two limitations. There is a limitation for the DSP controller. There is a separate limitation for the DSP controller controlling. If the court considers claim one, I would like to have your Honor have in mind that as Mr. Chessler said, if their claim one is right, figure two would invalidate claim one. After the preamble, the claim says there is a DSP controller. That's the first thing. The court construed that, and it construed it separately without referring to a global controller. The next limitation is the processing units, and the court, that's a separate structural element. The third element is the storage unit. Then we get to the limitation the judge was actually construing. Said DSP controller controlling said plurality of processing units. So the claim term he was construing was controlling. It is describing function. It's telling you what the DSP controller is doing, and the court is familiar. There are apparatus. But it continues to say controlling said plurality of processing units. That's correct. Then the question becomes what does that mean in the context of the patent. Qualcomm was incorrect. The judge didn't change directions. Here's what happened, and the judge was correct. He recognized that figures two and seven, if you hold them side by side, are what the patent says are the prior art and invention. Figure two has no global controller. Figure seven does. Even within what Qualcomm says is the DSP on figure seven, there's a line that extends to the DSP controller within what's described as the invention. Isn't the global controller in figure seven outside of the DSP? It is, but it's still controlling the DSP within the box. But doesn't claim three directed to what's inside the box in figure seven, the DSP? Your Honor, claim three is directed to the DSP controller, but then the question becomes what does it mean that the DSP controller is controlling? It doesn't say it's controlled by, it's controlling. It wouldn't be controlling the DSP controller. It's the reverse. If you consider what the specification says, this is where the district court recognized what this invention was about. It was about distributing control functions between the DSP controller and the global controller. That's what the specification says. And at A189 and 190 in the patent, you will find just that. But the problem is, is that what the claim covers? And your Honor, the question under Johnson worldwide is this. There is the word controlling. And it's controlling the processing units. And the question becomes given how this invention is described and what they claim the invention is over the prior art, what is controlling me? And more specifically, the question is how would one read it? Let me say these two points. The first is one of ordinary skill in the art would not read the patent claim to be self-invalidating in light of figure two. You just would. That's why they put the prior art there to say we're different. The second is the entire invention, the heart of the  is distributing control between two different entities. And lastly this. The district court didn't change instructions. At the Markman the district  didn't change this control. So controlling means either independently or under a control of the global controller. When Paul took the oar and made a summary judgment argument that was entirely inconsistent with what occurred at Markman, he went back and added that sentence that was solely to address what I would suggest was an incorrect reading of his claim interpretation. Thank you. Thank you very much. Mr. Chessler, we'll give you five minutes for rebuttal. Thank you very much. I'm going to take a page from my friend Mr. Lee's book. Let me start with the 686. As Judge Post correctly pointed out, the global controller is outside the DSP. The DSP controller is explicitly distinguished from the global controller throughout the specification. They are different. The claims at issue here claim only the DSP. They do not claim a global controller. The global controller is mentioned repeatedly in the claims of the 244 patent with respect to that larger video system that I mentioned which shares a common specification. They are different inventions sharing the same principle. They are multiple processing units within the box in the diagram, not the reverse. He has read a limitation which simply violates the rules of claim construction and it was error. Let me turn to the first paragraph. Respectfully, with respect to what Mr. Lee said, it is simply incorrect. Look at what column 53 says beginning at the paragraph that begins at line 40. In particular, you will see as you go down talking about the first paragraph, the master chooses to serve as one network based on network priority considerations and it goes on. That is exactly the point that the specification repeatedly makes. Where there are two you can talk to them simultaneously. Where there is one you can't. In fact, Mr. Lee tries to fix this problem by saying if you have done registration and then you go to sleep you are participating. There is not a word about registration in this claim. There is nothing to support the idea that once you have gone to sleep and you are not communicating that you are simultaneously participating. Even if you look at the diagram within the block that shows the participation there is a white space where it is communicating. There is a slash space where it is  not communicating. The question that we get with respect to the Verizon license answers the fundamental question. Did they satisfy the eBay standard showing that they wanted and had a right to exclude? There is no question after eBay a patent holder can get an injunction. The company licensed our largest customer. What they did was turn the industry into chaos. One of the reasons this courtroom is so crowded today is all the third parties barred from the district court. I tried the relief phase with Mr. Lee. Every one of the third parties tried to intervene. It has turned the industry upside down. The same chips go to Verizon. That is not what eBay permits. Everything that Mr. Lee pointed you to was after the complaint. This testimony about Dr. Padovani not checking into this. Lawyers were involved in defending the company. You will see there is nothing that suggests that is probative. You look at what happened before. The fact that he had a flood of lawyers defending a major  is not evidence. That is what the judge relied upon. That is not the law. That is what the district judge relied upon. I apologize for misstating that. I thought you were referring to a different figure. Unless the court has any questions, I have nothing further. I thank both counsel for their interesting and vigorous argument. The case is submitted. All